**In re MEDIMMUNE, INC. SECURITIES LITIGATION.**

No. PJM 93–3980.

United States District Court,
D. Maryland,
Southern Division.

Jan. 10, 1995.

Sherrie R. Savett, Berger & Montague, P.C., Philadelphia, PA, for plaintiff.

Harvey Kurzweil, Dewey Ballantine, New York City, for defendant.

## OPINION

MESSITTE, District Judge.

### I.

Plaintiffs, who seek to represent a class of persons purchasing common stock of Defendant MedImmune, Inc. between January 4 and December 2, 1993, have sued the corporation and various of its officers, alleging violations of federal securities law, common law fraud, and negligent misrepresentation. Defendants have filed a Motion to Dismiss for failure to state a claim under Fed.R.Civ. Proc. 12(b)(6) and failure to plead fraud with particularity as required by Rule 9(b). The Court has determined to grant the Motion, except with regard to:

(1) Defendant Mott's statement of April 27, 1993 that "[t]here's absolutely no question about efficacy (of the drug Respivir)";

(2) Defendant Hockmeyer's statement of September 1, 1993 of the reasons why the U.S. Food and Drug Administration (FDA) postponed its review of the product licensing application for Respivir;

(3) Hockmeyer's alleged statement on September 8, 1993 regarding the reasons for the delay of review of the drug by the FDA;

(4) Defendant MedImmune's press release of November 17, 1993, insofar as it endorsed the *New England Journal of Medicine* article on the Respivir study, specifically the assertion in the article that the study was conducted on an "intention to treat" basis; and

(5) The *New England Journal of Medicine* article of November 18, 1993, as co-authored by Defendant Top and endorsed by MedImmune, specifically insofar as the article reported that the study of Respivir had been conducted on an "intention to treat" basis.

The Motion to Dismiss will be granted as to all other statements and as to all Defendants except those expressly making or endorsing one of the above-referenced statements, *i.e.*, except as to Defendants MedImmune, Hockmeyer, Mott and Top.

### II.

Defendant MedImmune, a Delaware corporation based in Gaithersburg, Maryland, researches, develops, manufactures and markets therapeutics and vaccines for the treatment and prevention of certain infectious diseases. The company's common stock is listed and traded on the National Market System. The company has only one product approved for sale by the U.S. Food and Drug Administration (FDA), namely CytoGam, a polyclonal antibody product for the prevention of disease in kidney transplant patients. A second product known as Respivir (or Respigam or RSVIG), was at all relevant times under review for marketing approval by the FDA. The present lawsuit concerns Respivir.

Respivir, a blood plasma derivative, is a polyclonal antibody product used intravenously for the prevention of respiratory syncytial virus (RSV). RSV is the leading cause of pneumonia and bronchiolitis or lower respiratory infection (LRI) in infants, primarily children less than 2 years of age. According to an April 27, 1994 press release of MedImmune, more than 90,000 hospitalizations and 4,500 deaths occur each year in the United States as a result of RSV infection in children. As of December 1992, when MedImmune filed a product license application (PLA) seeking marketing approval for Respivir from the FDA,[1] no other product was licensed for the prevention of RSV disease in the United States.

With the filing of the PLA, MedImmune's financial prospects began to soar. On July 14, 1993, MedImmune announced that it had

---

1. The usual sequence prior to the filing of a PLA is for a drug to undergo preclinical testing (*i.e.* in the laboratory and on animal subjects) and three phases of clinical testing. *See In re Synergen, Inc. Sec. Litig.*, 863 F.Supp. 1409, Fed.Sec. L.Rep., Par. 98, 410 (D.Colo.1994). The PLA, a compilation of all relevant data regarding the drug, is reviewed by a team of FDA personnel and, in significant instances, forwarded to an advisory committee of outside experts. *See* 21 C.F.R. §§ 14.1, 14.100(b)(3). The committee reviews the data and ultimately recommends to the FDA whether the PLA should be approved and for what uses. Respivir proceeded according to this sequence, with the data being forwarded to the FDA's Blood Products Advisory Committee.

signed a letter of intent with American Cyanamid Company to form an alliance in the United States for the development and marketing of three generations of products for RSV (as well as for the marketing of a new product developed by Cyanamid). On August 13, 1993, MedImmune announced a $21 million private placement of newly issued common stock with a number of institutional investors. According to the announcement, MedImmune intended to use the net proceeds from the placement for, among other things, operating expenses and investments in inventory and receivables associated with preparing for and launching Respivir. On September 14, 1993, MedImmune announced that it had signed a letter of intent to acquire Melville Biologics, a developer of blood derivative products, for $40 million in newly issued shares of MedImmune, an acquisition which, according to MedImmune, would provide additional manufacturing capacity for Respivir. On November 9, 1993, the company reported improved third quarter results and publicized that it had signed a definitive agreement with Cyanamid to form the previously publicized alliance.

On December 2, 1993, the bottom fell out of the market for MedImmune stock.[2] On that date, the Blood Products Advisory Committee of the FDA held its hearing on the PLA for Respivir and, citing various flaws in the study design, voted 11 to 0 against recommending approval of the drug by the FDA.

At the hearing various presenters came forth to make the case that Respivir was safe and effective.[3] The presenters included Dr. George Siber, Director of the Massachusetts Public Health Biological Laboratories, Associate Professor of Medicine at Harvard University and consulting physician in infectious diseases at the Dana–Farber Cancer Institute and Children's Hospital in Boston; Dr. Jessie Groothuis of the University of Colorado Children's Medical Center; and Defendant Top, who was identified to the panel by Dr. Siber as a pediatric infectious disease specialist with special interest in respiratory viral infections and one who, prior to joining MedImmune, had been Director of the Walter Reed Army Institute of Research.

Dr. Siber told the Committee of the development of Respivir and described studies relative to the preparation of the drug. Dr. Groothuis described the multi-center double blind evaluation of Respivir in preventing RSV infections as reported in an article published just a few weeks before in the *New England Journal of Medicine;* and Dr. Top discussed the safety of Respivir in high risk children. Dr. Siber stressed the "truly ... collaborative effort" that characterized the development and evaluation of Respivir.

He concluded the presentation to the Advisory Committee by summarizing several main points:

First ..., RSV is the single most common cause of respiratory infection in children. This virus causes particularly severe illness, with substantial morbidity, in high risk children with prematurity and chronic lung disease. About one in 4 high risk infants develop RSV LRI (lower respiratory infection) in any given season.

Second, there is currently no effective preventive measure available for RSV. RSVIG (Respivir) thus offers a unique therapeutic modality. RSVIG is a well-characterized immune globulin which is selectively enriched, about five to ten-fold, in RSV neutralizing activity.

[Further], RSVIG ... is safe in infants with prematurity and chronic pulmonary disease.

[Finally], RSVIG clearly prevented severe disease, not only as measured by an objective scoring system, but also by more practical real life measures, such as hospitaliza-

---

**2.** The stock, which had traded as high as $31.25 per share as of November, 1993, fell to $11.75 per share on December 3, 1993.

**3.** In connection with the Motion to Dismiss, the parties have submitted the transcript of the Advisory Committee hearing as well as numerous other documents to the Court. The Court considers these documents inasmuch as they are referred to in the Consolidated Amended Complaint and relied upon by Plaintiffs in bringing the action. *See Cortec Indus. Inc. v. Sum Holding L.P.,* 949 F.2d 42, 46–48 (2d Cir.1991), cert. den. —— U.S. ——, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992).

tion with RSV infection and ICU admission with RSV infection.

Dr. Siber closed on the following note:

> I'd like to conclude by thanking our colleagues at FDA for their extraordinary efforts in reviewing our PLA submissions in a thorough and timely manner so that this meeting could be scheduled at this time, just before the onset of the RSV season.

> If the product is promptly approved, we believe that we can make it available to a substantial number of high risk children during this season and then fully introduce the product before the onset of the next season.

In the question and answer period that followed, however, Advisory Committee members expressed concern that inadvertent bias in the study design might have undermined the reliability of the data. For instance, although FDA staffers agreed that the deaths of 6 of the 249 children participating in the study were not statistically significant and that there was no evidence linking the deaths to the drug, Committee members favored further study to determine the extent to which treatment with the drug may have contributed to the deaths. At least a few members, however, stated unequivocally that they believed the data indicated the deaths were not related in any way to the treatments.[4]

4. In the July 21, 1994 edition of the *New England Journal of Medicine*, published several months after the Blood Products Advisory Committee hearing, FDA staffers commented on the concern they had had with this issue during the review process:

> As the report made clear, six children in this study died, none from RSV infection.... None of these deaths were clearly attributable to treatment, although in two cases treatment could have exacerbated the fluid overload that contributed to the deaths.

The authors of the study replied in the same *New England Journal of Medicine* issue:

> Space limitations in our article did not permit us to describe the extensive investigation of the deaths of study patients that we presented to the FDA. A review of case histories by two independent pediatric cardiologists yielded that no temporal association or plausible link between the study infusion and death in five patients with cardiac disease.

At the December 1993 meeting, Advisory Committee members also expressed concern about the concentration of treatment response at the Denver site, as well as the enrollment procedure used there, which they believed might have compromised random assignment of trial participants to treatment groups. Specifically, the nurse coordinator who enrolled the children in the study at the Denver site was said to have known the patient histories and interim results of the trial and therefore was not blinded to the test participants. While there was no evidence of purposeful assignment by the nurse coordinator in Denver, inadequate randomization and blinding at that site apparently gave the Committee pause because the incidence of RSV LRI and evidence of a treatment effect were in fact considerably higher at Denver than at the other four test sites and thus may have driven the overall study results. Some Committee members, however, acknowledged that possible explanations for the more significant results at the Denver site might have been Denver's high altitude or other local environmental factors as opposed to selection bias.[5]

Finally, Advisory Committee members expressed concern about the lack of follow-up data for 17 patients who had dropped out of the trial, on the grounds that, without knowing if any of the dropouts had contracted RSV LRI, the statistical significance of the 17 dropouts could not be properly measured.[6]

As to the infant who died, the authors continued, that infant had bronchopulmonary dysplasia and died 3 months after the infusion of the drug. However, according to the authors, "[i]n a subsequent open-label trial of high-dose intravenous RSV immune globulin in 68 infants with bronchopulmonary dysplasia or prematurity, no deaths have occurred to date."

5. Moreover, in the July 21, 1994 *New England Journal of Medicine*, the authors of the study indicated that: "[a]lthough the advisory committee expressed concern about the method of randomization at Denver, a thorough audit revealed no evidence of bias in treatment assignment by the study nurse."

6. FDA staffers elaborated this concern in the July 21, 1994 issue of the *New England Journal of Medicine*:

> The published report stated that all analyses followed the intention-to-treat principle. The

The day following the Advisory Committee vote *Biocentury* (The Bernstein Report on Biobusiness) carried an article reporting the vote. The article indicated that at least some FDA analysts believed the data supported MedImmune's assertion that Respivir reduced the frequency and severity of RSV LRI. Moreover, the same article quoted Jay Epstein, Acting Director of the FDA's Office of Blood Research and Review, as saying that the Advisory Committee's failure to recommend Respivir for approval "could have been prevented with better attention all around," including communications between and among the FDA, the National Institutes of Health, and MedImmune. Epstein reportedly told *Biocentury* that "[t]he error was in not recognizing that the less rigorous procedures were not acceptable." On the other hand, Dorothy Scott, a staff fellow in the same FDA office, reportedly told *Biocentury* that the FDA had been warning MedImmune "for a long time" about problems with the study design, suggesting that there could have been problems with randomization "as early as August, when a letter was sent out asking for more information." Scott is reported to have further stated that MedImmune appeared to understand FDA's position and simply disagreed.

material submitted to the FDA specifically stated that all children who underwent randomization and for whom written informed consent was obtained were followed for outcome assessment. In fact, this was not the case. Eight children who were identified as study participants were not followed, because of failure to obtain written informed consent or ineligibility discovered after entry into the study. Seven of these eight were assigned to an active-treatment group. Seventeen children were known to be eligible and to have had written consent provided, but they were not followed and therefore were not included in the report. All 17 children had been assigned to one of the two active-treatment groups. Although the numbers are small, these children appeared to differ from the children remaining in the study in a number of ways. They tended to be younger, had lower birth weights, were more likely to be female and nonwhite, had fewer prior infections, and in almost all cases had bronchopulmonary dysplasia or premature birth. Furthermore, the dropouts were predominantly from two of the five study sites. All these imbalances, particularly the imbalance in treatment assignment, suggest that the dropouts were not a random subsample of the

III.

A.

Plaintiffs contend that Defendants knew about or recklessly disregarded the Respivir study design limitations from the outset. In particular, Plaintiffs say, Defendants knew or should have known:

(a) that the deaths of the 6 patients in the study might have been related in some way to the administering of the drug;

(b) that there were problems with randomization of the Denver patients and that those Denver results disproportionately contributed to the conclusion that Respivir was effective in preventing RSV;

(c) that the study at the Denver site was not properly blinded to prevent bias; and

(d) that the trial was not conducted on an "intention to treat" basis because the data did not include results for patients who had been enrolled in the trial but had dropped out and were not subsequently followed to see if they developed further infections.

Each of these concerns, Plaintiffs suggest, was communicated by FDA to Defendants at various stages of the PLA review process

originally randomized group, hence the assumption that they were prognostically similar to the other children may not be valid.
To this the authors replied:
"Our report analyzed all 249 children described by the investigators, whether or not the children received any treatment. While our article was in press, an FDA-requested review identified 25 dropouts who had been randomized but not included in the analysis.... For all 25 children, we reviewed the hospital records or interviewed the parents or physicians, and we found that there had been two additional hospitalizations related to RSV, both in the high-dose group.... [T]he efficacy of high-dose treatment remains significant after the inclusion of all the dropouts in the intention-to-treat analysis. An intention-to-treat analysis of all 257 randomized, eligible, enrolled children yields a 65 percent reduction in hospitalization with RSV in the high-dose group (p = 0.01)."
The authors ended their response by reaffirming their confidence in the study: "We continue to believe that intravenous RSV immune globulin is safe and effective in preventing severe RSV disease in infants at high risk."

and constituted unmistakable notice that ultimate approval of the drug by the FDA was in jeopardy.

According to Plaintiffs, Defendants nonetheless caused false or misleading statements to be made or omitted to make clarifying statements, which had the effect of adversely affecting the integrity of the market for MedImmune's stock and artificially inflated the stock's price. Individual officers and directors are said to have acted as either direct participants or aiders and abettors of other Defendants in perpetrating the several violations. Plaintiffs do not contend, however, that any individual Defendants, to the extent they may have been shareholders of MedImmune, attempted to sell or otherwise dispose of their stock during the period the alleged fraudulent or misleading statements were made.

Defendants counter sharply. They answer that the Consolidated Amended Complaint fails to allege any statements or omissions which were materially false or misleading; indeed they say that certain alleged "omissions" were actually disclosed by them. They further fault the Consolidated Amended Complaint for failing to plead scienter or recklessness with appropriate particularity. They submit that Plaintiffs have alleged insufficient facts to attribute the statements of independent securities analysts to any Defendant and also that the Consolidated Amended Complaint fails to state a claim of secondary liability against any Defendant because, among other things, no private right of action for aiding and abetting exists under federal securities law. Finally, Defendants ask that Plaintiffs' state law claims be dismissed.

### B.

In considering Defendants' Motion to Dismiss under Rule 12(b)(6), the Court takes all allegations of material fact in the Consolidated Amended Complaint as true, construing them in a light most favorable to Plaintiffs. *H.J. Inc. v. Northwestern Bell Telephone Company, Inc.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Finlator v. Powers*, 902 F.2d 1158 (4th Cir.1990); *In Re*

*U.S.F. & G Sec. Litig.*, 1993 WL 740188 1993 U.S. Dist. Lexis 10064 (D.Md. February 11, 1993), *aff'd* 16 F.3d 411 (4th Cir.1994). But the core federal claim in this suit, as set forth in Count I of the Consolidated Amended Complaint, is a fraud claim made under Section 10(b) of the Securities Exchange Act of 1934 and rule 10(b)–5, *see* 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5, which consists of five elements:

1) A false statement or omission of material fact made by defendant;

2) With scienter;

3) Upon which plaintiff justifiably relied (although when, as here, purchasers of stock pursue an action under a "fraud on the market theory," they are relieved of proving the element of direct reliance); and

4) Proximate damage to plaintiff.

*See Malone v. Microdyne Corporation*, 26 F.3d 471, 476 (4th Cir.1994); *Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1260–61 (4th Cir.1993).

That being so, while the Court must liberally construe the Consolidated Amended Complaint and must accept the material factual allegations as true, *id.*, Rule 12(b)(6) must be read in conjunction with Rule 9(b) which imposes special pleading requirements on securities and other fraud claims: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

Particularity of pleading is required with regard to the time, place, speaker and contents of the allegedly false statements, as well as the manner in which statements are supposedly false and the specific facts which raise an inference of fraud. *Gollomp v. MNC Fin. Inc.*, 756 F.Supp. 228, 232 (D.Md. 1991); *Borow v. nView Corp.*, 829 F.Supp. 828, 833 (E.D.Va.1993). Moreover, specific statements must be attributed to specific individuals, *see Juntti v. Prudential–Bache Sec., Inc.*, 25 Fed.R.Serv.3d 1460, 1993 WL 138523 (4th Cir., May 3, 1993).[7] Comparable

---

7. Plaintiffs rely on the "group published information" doctrine, which presumes for pleading pur-

specificity is required where, as here, Plaintiffs attempt to fix liability on every Defendant for every statement made by every other Defendant based on Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), which imposes secondary liability for § 10(b) and Rule 10(b)–5 violations upon "controlling persons" for acts committed by persons under their control. Allegations of "control" must set forth that a given Defendant had both the power to control a person and that the Defendant, in bad faith, directly or indirectly induced the act constituting the violation. *See Carpenter v. Harris, Upham & Co.,* 594 F.2d 388, 394 (4th Cir.), *cert. denied* 444 U.S. 868, 100 S.Ct. 143, 62 L.Ed.2d 93 (1979); *Walker v. Cardinal Sav. & Loan Ass'n,* 690 F.Supp. 494, 500 (E.D.Va.1988). Status or position by themselves will not suffice to state a claim of "control," *see Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1441 (9th Cir.1987), nor will mere ownership of stock, *Pharo v. Smith,* 621 F.2d 656, 689–71 (5th Cir.1981). Finally, to the extent that independent statements of third parties may be involved, the complaint must plead with specificity which Defendant supplied the information to the third party, how it was supplied, and how the Defendant could have controlled the content of the statement. *See Raab v. General Physics Corp.,* 4 F.3d 286 (4th Cir.1993).

Within this framework the Court considers the purportedly fraudulent or misleading statements or acts made by various Defendants or by market analysts during the months preceding the Blood Products Advisory Committee vote.

### IV.

#### A.

The Consolidated Amended Complaint sets forth that:

1) On January 4, 1993, a MedImmune press release quoted Defendant Hockmeyer, Chief Executive Officer of MedImmune and a member of its Board of Directors, to the effect that the Respivir PLA filing was "an important milestone in the development of MedImmune as an integrated biotechnology company developing and marketing its own products.... Respivir has the potential to reduce serious RSV disease in children and could be a major advance in pediatric health care, if and when approved by the FDA."

The release further indicated that

MedImmune began a pivotal efficacy trial for prevention of RSV disease in children in 1989. The trial has been conducted in five centers throughout the United States and through three RSV seasons. Physicians involved in the trial include leading experts in RSV and respiratory disease in children. The trial was concluded in April 1992, and its results provide the basis for the PLA submission.

The release went on to say that

[a]s a result of agreements with the physician investigators involved in the RSV prevention trial, MedImmune is not in a position to discuss the results of the trial until the physicians have publicly presented the data. The first presentation of data is planned for the Society for Pediatric Research meeting scheduled for the first week of May 1993. Results of the trial are also being prepared by the investigators for publication in a medical journal.

In at least two other paragraphs of the press release, MedImmune discussed the potential for Respivir "if and when approved by the FDA."

2) On January 7, 1993, Nomura Research Institute of America, Inc. issued a report stating, among other things, that

[w]e believe investors should focus their attention on Respivir, a new immunotherapeutic for the prevention of RSV.... We understand [MedImmune] had been meeting with the FDA prior to the PLA submission in order to preempt any misinterpretations in the data. We anticipate FDA approval for prophylaxis indication during

poses that officers and directors in day-to-day control of a company are collectively responsible for the company's "group published" information, such as press releases. *See, e.g., In re Marion Merrell Dow Sec. Litig.,* Fed.Sec.L.Rep.

(CCH), Par. 97,776, 1993 WL 393810 (W.D.Mo. 1993). That doctrine, however, is squarely at odds with *Juntti* and the Court declines to recognize it.

the first half of 1994, with the treatment claim following later that year.

We expect rapid penetration (50% prevention and 30% treatment), resulting in potential sales of $150–$170 million by 1996–1997.

3) On January 18, 1993, Vector Securities International Inc. indicated that "[v]alidation of the clinical significance of this Phase III study is not years away, but rather months."

4) On February 8, 1993, the *Washington Post* quoted Defendant Kishbauch, then Executive Vice–President and later President and Chief Operating Officer of MedImmune, as saying that "Respivir can sustain us very nicely through the rest of the century."

5) On February 10, 1993, the *PR News Wire* quoted Defendant Hockmeyer as indicating that CytoGam and the PLA for Respivir "represent two important milestones in the development of MedImmune as an integrated Company developing and marketing its own products.... The Company is now poised to generate increased sales revenue in future years, particularly when and if Respivir is approved by the FDA."

6) On or about April 27, 1993, the *Dow Jones Professional Investor Report* quoted Defendant Mott, Vice–President of Business Development and Planning for MedImmune, as stating that "[t]he results of treatment with Respivir were highly statistically significant along all of the efficacy parameters built into the Phase III study. There's absolutely no question about efficacy.... The data were overwhelmingly good.... We've exceeded the rule of thumb standards."

Mott was reportedly acknowledged that six patient deaths had occurred during the trial but indicated that "[n]one of the deaths were attributed to the treatment." "Extensive analysis," he said, "of all fatalities by independent physicians concluded that in no way could the fatalities be linked to the drug."

According to the *Dow Jones* report, MedImmune also stated that "[c]hildren also were followed over a second RSV season and no long term safety issues were observed."

7) On April 27, 1993, the *Dow Jones News Wire* quoted Defendant Hockmeyer as stating, "We are quite enthusiastic about the results from the study and their implications for preventing this serious illness."

8) On May 4, 1993, the *Baltimore Sun* reported that "researchers will announce the complete results from the last phase of clinical studies on Respivir. The Company already has said that the drug will be shown to be effective...."

9) On May 6, 1993, MedImmune issued a press release indicating that Respivir "has been demonstrated to be effective in preventing severe, sometimes fatal, lung infections in high risk infants and children."

10) On May 10, 1993, the *PR News Wire* quoted Defendant Hockmeyer as stating that "MedImmune, by ... conducting market research and market development in preparing to launch Respivir (TM) (if and when approved by the U.S. Food and Drug Administration) has made a significant investment in its future."

11) On June 28, 1993, Hambrecht & Quist, Inc. initiated coverage of the stock with a "buy" recommendation, stating in its report that Respivir was "the single biggest reason for our purchase recommendation."

The report went on to say that

"Respivir has generated excellent results in a Phase II/III pivotal clinical trial in which the product was administered prophylactically to children at high risk of suffering from an RSV infection.... [A]ll of the results were statistically significant. These numbers suggest to us that Respivir is a highly efficacious product that could substantially lower the costs involved in treating children with RSV disease."

12) On July 1, 1993, *Antiviral Agents Bulletin* stated that "Respivir ... has been shown to be safe and 'extremely efficacious.' ... MedImmune expects Respivir approval early next year for prophylactic indications."

13) On July 14, 1993, the *Wall Street Journal* and *Dow Jones News Wire* quoted Defendant Mott as saying that "[b]y working with Cyanamid and Lederle in the U.S. ... we believe we can increase the market for Respivir, and the opportunity for MedImmune and our shareholders, over what we would have had working alone."

14) On August 6, 1993, *Dow Jones News Wire,* while reporting that MedImmune had suffered a loss for the second quarter of 1993, indicated that the period included marketing and selling expenses "associated with relaunching CytoGam and preparations to launch Respivir, if and when it is approved by the Food and Drug Administration."

15) On August 16, 1993, Baltimore's *Daily Record* stated that "MedImmune appears set to launch its second product, if it is approved by federal regulators, as company officials hope."

Defendant Mott was quoted as saying, "We think it's very important to be in position for the launch of Respivir and we want to have a strong cash balance."

16) On August 23, 1993, MedImmune announced that the Blood Products Advisory Committee of FDA would meet on September 23 to review the company's application for marketing approval of Respivir, stating that the effect on earnings and relevant news would be "significant" in the event of approval.

17) On or about August 24, 1993, *Dow Jones News Wire* reported that "the rapid time of the review bodes well for approval of [Respivir] by year-end. . . ."

18) On September 1, 1993, quoting Defendant Hockmeyer, MedImmune announced that the FDA had postponed its review of the Respivir PLA, indicating that

[t]here are a lot of things that had to happen in a short time frame and a few pieces of data that need to continue to be analyzed. Until they (the FDA) reach a comfort level of having gone through everything, they don't feel comfortable going through the Advisory Committee. I don't think it's anything more than that. We understand and accept that.

19) On September 8, 1993, Baltimore's *Daily Record* reported that "Company officials maintain the delay of the review is no cause for alarm. According to a statement by Hockmeyer, the FDA has not been able to complete all of its necessary work on the application."

20) On November 8, 1993, Goldman, Sachs initiated coverage of MedImmune with a "buy" rating.

21) On November 15, 1993, Alex. Brown and Sons initiated coverage of MedImmune with a "buy" rating, citing an article in the November 18, 1993 issue of the *New England Journal of Medicine* in which Respivir, "the Company's most important near-term product, was shown to be safe and remarkably effective."

22) On November 16, 1993, the *Dow Jones News Wire* reported that Respivir would be reviewed by the Blood Products Advisory Committee on December 2, 1993.

23) On November 17, 1993, MedImmune issued a press release stating that the *New England Journal of Medicine* had accepted an article for publication concerning the Phase III trial of Respivir. The press release stated that "[t]he publication underscores the potential value of [Respivir] (TM) in preventing RSV disease." The press release then summarized the article in the *New England Journal of Medicine,* indicating that a group of 17 physicians from five clinical centers around the United States had been involved in the study; that they had been led by Dr. Jessie R. Groothuis of the University of Colorado Health Sciences Center; and that the three year study included 249 children from three high risk groups. The release stated that Respivir was administered intravenously on a monthly basis starting prior to and continuing during the RSV season (November to April) at various doses to various groups. The press release concluded that the results of the study showed that high dose Respivir "significantly reduced the severity of RSV and significantly reduced the frequency of RSV-related hospitalizations."

24) On or about November 18, 1993, the *New England Journal of Medicine* published the article as reported by MedImmune's press release, listing as a co-author Defendant Top, Executive Vice-President, Medical Director and Director of MedImmune. The report indicated, among other things, that "a total of 249 children were enrolled in the study," that "all analysis were performed according to the intention-to-treat rule," and

that "data on all 249 children were analyzed for efficacy."

25) On November 24, 1993, Alex Brown and Sons issued a report which stated that, "[b]ased on thorough analyses of the clinical data, we believe there is a higher probability that [Respivir] will be approved, most likely in the first half of 1994."

The report also stated that, among the near-term portfolio of six products, "the product offering the most significant revenue-generating potential is [Respivir]. . . . [I]t is our opinion that this study (1) confirms the critical medical problem that RSV represents, and (2) demonstrates that [Respivir] is both safe and extremely effective. As a result, we believe the study will support FDA approval of the product."

On December 3, 1993, the day following the Blood Products Advisory Committee's unanimous vote not to recommend approval of Respivir, press reports took on a far more negative cast. The first of the class action shareholder suits, now consolidated in the present action, followed immediately.

### B.

Before all else, it is important to be clear as to the nature of the misrepresentations Plaintiffs allege.

To begin, even though particular Defendants are alleged to have made particular statements, Plaintiffs appear to attribute all statements to all Defendants, which is an impermissible aggregation of Defendants under *Juntti*, 25 Fed. Rules Serv.3d at 1461. Therefore, except to the extent that Plaintiffs seek to impose secondary liability upon "controlling persons" under the 1934 Act, Plaintiffs will be confined to their claim against the specific alleged declarant or endorser of a given statement and no one else. However, even with regard to the claims of secondary liability, it does not suffice for Plaintiffs merely to plead a defendant's position, *Wool*, 818 F.2d at 1441, or stock ownership, *Pharo*, 621 F.2d at 669–71. Specific allegations of control and culpable conduct are required.

*Carpenter*, 594 F.2d at 394. Given the absence of such allegations here, Defendants' Motion to Dismiss will be granted as to all claims of secondary liability, with limited possible future exceptions: As to the few actionable statements that the Court will permit to go forward, as discussed *infra*, if during discovery Plaintiffs are able to develop appropriate evidence of "control" and "culpable conduct" by one Defendant over another Defendant's statement, Plaintiffs may seek leave of the Court to amend their complaint to replead, with appropriate precision, a claim of secondary liability.[8]

Moving from matters of who may be liable to what was said, in one sense Defendants' purported misrepresentation is a cumulative one, comprised of all statements made by all its officers and affiliates, and all market analysts taken together. In a second sense, various individual statements are said to be false and misleading. The Court considers these two formulations.

■ As to the first, although Plaintiffs' counsel seemed to back away from the position at oral argument, the Consolidated Amended Complaint does allege that Defendants, through their statements, were attempting to provide the highest degree of assurance that the FDA would approve Respivir. But while it is true that a "guarantee" of approval of a product by a federal agency might be actionable, *cf. Raab*, 4 F.3d at 290, the key word is "guarantee." Mere expressions of hope or expectation regarding future approval, not worded as guarantees, are not actionable. Especially is that so where, as here, virtually every reference made by any Defendant to FDA approval was hedged by variations of the proviso "if and when approved by FDA" (*see* MedImmune Press Release of 1/4/93; PR News Wire of 2/10/93; PR News Wire of 5/10/93; Dow Jones News Wire of 8/6/93). *See Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204, 218 (4th Cir., 1994) (cautionary language usually "not the stuff of which securities fraud claims are made"); *see also Warshaw v. Xoma Corp.*, 856 F.Supp. 561 (N.D.Cal.1994).

---

8. Plaintiffs will not, however, be permitted to proceed based on theories of aiding and abetting or, by extension, conspiracy, which are precluded by *Central Bank of Denver v. First Interstate Bank of Denver*, —— U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

Since Plaintiffs have failed to plead facts that even remotely suggest Defendants were guaranteeing approval of Respivir by the FDA, insofar as Plaintiffs would proceed on that theory, their claim is insufficiently pled and will be dismissed.

Most if not all other purportedly false or misleading statements also fail to pass muster at this stage. A number of statements no more than express the company's expectation that Respivir, if approved, could prove profitable (*see* statements of 2/8/93, 2/10/93, and 8/16/93), again not only an expression of hope or expectation but a rather obvious fact.[9] Other statements simply report, accurately as it happens, the steps being taken by the company to prepare for the manufacturing and marketing of the drug (*see* statements of 7/14/93; 8/13/93; 9/14/93; and 11/9/93).

■ At the same time, several allegedly false or misleading statements regarding the prospects of the drug for approval or its financial potential came not from Defendants but from market analysts or newspaper stories, without attribution to any particular Defendant. *See, e.g.,* Nomura Research Institute report of 1/7/93; Vector Securities International Inc. report of 1/18/93; Dow Jones News Wire of 4/27/93; Anti–Viral Agents Bulletin of 7/1/93; Daily Record of 8/16/93; Dow Jones News Wire of 8/23/93; Alex. Brown and Sons Report of 11/24/93. But as stated in *Raab,* 4 F.3d at 286, statements of independent market analysts are not actionable unless Plaintiffs can plead with particularity who among Defendants supplied the information, how it was supplied, and how Defendants could have controlled the content of the statement. The same is true with regard to newspaper accounts. *See, e.g., Ferber v. The Travelers Corp.,* 785 F.Supp. 1101, 1108 (D.Conn.1991) ("[T]he strictures of Rule 9(b) are not satisfied by indirect quotes from a newspaper reporter's notebook.") Since no such allegations appear in the Consolidated Amended Complaint, none of the statements emanating from the

market analysts can fairly comprise part of any viable claim against Defendants and the Consolidated Amended Complaint must be dismissed as to such statements.

■ On the other hand, a few statements made by one or more Defendants present closer questions as to their potential for being false or misleading. Those statements involve 1) claims pertaining to the validity of the test data, 2) in particular the claim by Mott to the unquestionable efficacy of Respivir, 3) the reasons given by MedImmune and Hockmeyer for postponement of the first scheduled review of Respivir by the Blood Products Advisory Committee, and 4) claims by MedImmune and Top that the Phase III Study was conducted according to the "intention to treat" protocol.

Several statements fall into the first group, *i.e.* those pertaining to the validity of the test data. On April 27, 1993, for instance, Hockmeyer was quoted as saying, "We are quite enthusiastic about the results from the study and their implications for preventing this serious illness." Further, in its November 18, 1993 press release regarding the upcoming *New England Journal of Medicine* article, MedImmune declared that "[t]he publication underscores the potential value of [Respivir] in preventing RSV disease." In the same press release, the company asserted that "[t]he results of the study show that high dose [Respivir] significantly reduced the severity of RSV and significantly reduced the frequency of RSV-related hospitalizations." Plaintiffs contend that such statements were false and misleading because, given the flaws in the design of the study, the efficacy of the drug was not in fact established, something Defendants knew or should have known.

Yet it is clear that Plaintiffs have not pleaded that the drug was in fact *inefficacious,* only that as of December 2, 1993, the Blood Products Advisory Committee of FDA was not convinced of its efficacy.[10] What is also clear is that Defendants and their affiliates developed data which they believed sup-

---

**9.** *See Raab,* 4 F.3d at 291 (no duty to disclose information of common knowledge).

**10.** According to the *Biocentury* article of December 3, 1993, apart from the study design issues,

Scott and other FDA analysts said "the data supported [MedImmune's] assertion that [Respi-

ported their conclusions regarding the drug's efficacy. Two independent pediatric cardiologists, for instance, found essentially no link between the patient deaths and the drug during the study.[11] An eventual audit revealed no bias in treatment assignment by the study nurse at the Denver site. Follow-up study of the patients who had been randomized but not included in the analysis caused no change in the researchers' conclusions as to the drug's efficacy. In other words, with perhaps a single exception to be noted, Plaintiffs have not pleaded in appropriately specific fashion that Defendants' statements regarding the efficacy of the drug were either false or misleading.

█ Nor, with the exception to be noted, does it matter that one or more FDA staffers may have questioned MedImmune or its affiliates about the study design during the review process. Mere questioning by the FDA imposed no duty upon Defendants either to trim back their opinions as to the efficacy of the drug or to report to the public the FDA staffers' questions as they arose. Continuous dialogue between the FDA and the proponent of a new drug is the essence of the product license application process. Questions may emanate from one or more staffers in random or sporadic fashion. Many, if not all, questions presumably get answered in the process. Requiring ongoing disclosure of FDA's questions would not only be disruptive to the review process; it could easily result in misleading the public more than not reporting the questions. Where mere disclosure of a question might cause the company's stock to decline in value, the eventual answer to the question might cause it to rise once again. Investors who sold that stock when the FDA's question was asked but before the company's answer was given might have legitimate cause for concern when a satisfactory answer came forth and the stock's price began to climb again. As defense counsel cogently argues, Defendants might then find themselves defending the opposite of the present lawsuit. "In order for there to be liability under 10b–5 for omissions or nondis-

closure, ... a duty to speak must exist." *Walker v. Action Industries*, 802 F.2d 703, 706 (4th Cir.1986), *cert. denied*, 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1000 (1987). The Court finds Defendants, as a general proposition, had no duty to report its ongoing discussions with FDA during the review process.

█ Equally important, whatever may be Plaintiffs' claim as to the theoretical invalidity of the test data, their complaint falters on the matter of scienter which, in the context of this suit, "refers to a mental state embracing intent to deceive, manipulate, or defraud," *Malone*, 26 F.3d at 478. Plaintiffs have pleaded no facts, beyond mere conclusory statements, that would support either an inference of bad faith or an inference that Defendants acted with an intent or recklessly to deceive, manipulate, or defraud. *See Id.; Juntti*, 25 Fed.R.Serv.3d at 1461.

Nothing in the transcript of the proceedings before the Advisory Committee cited by Plaintiffs suggests such a thing, indeed nothing any FDA staffer is quoted as saying after the fact would suggest that to be the case. Certainly the presentations made in favor of Respivir before the Advisory Committee bespoke only good faith belief on the part of the presenters and, by implication, the company. Nor do Plaintiffs fairly plead the manner in which Defendants acted with reckless disregard as to the validity or invalidity of the data. Medical researchers may well differ over the adequacy of given testing procedures and in the interpretation of test results. Although the Advisory Committee may have disagreed, there is nothing to suggest that Defendants could not reasonably have entertained the opinion, for example, that the concentration of test results at the Denver site was a function of either or both the altitude or the higher proportion of bronchopulmonary dysplasia patients at that site. Simply to aver that the Advisory Committee, based on theoretical (not to say inappropriate) statistical concerns, eventually challenged the company's opinion, is not to say that Defendants should have had knowledge

---

vir] reduces the frequency and severity of RSV LRI."

11. Moreover, the fact of the patient deaths was clearly disclosed by Defendant Mott in his statement of April 27, 1993.

of the theoretical statistical limitations on their assumptions. The same may be said, with regard to the alleged improper blinding of the Denver study. Plaintiffs have pleaded no specific facts to show why Defendants knew or should have known this to be a problem, particularly given the company's apparently undisputed conclusion, after the fact, that there was no evidence of *actual* bias in treatment assignment by the Denver study nurse. "Mere allegations of 'fraud by hindsight' will not satisfy the requirements of Rule 9(b)." *Hillson Partners Ltd. Partnership*, 42 F.3d at 209; *see also Schwartz v. Novo Industries A/S*, 658 F.Supp. 795, 799 (S.D.N.Y.1987).

■ Still, it is one thing to declare enthusiasm "about the results from this study and the implications for preventing this serious illness," as Hockmeyer did on April 27, 1993, or to say, as the company did in its November 17, 1993 press release, that a high dose of Respivir "significantly reduced the severity of RSV and significantly reduced the frequency of RSV related hospitalizations." It is quite another thing to make a statement that falls into the second category of arguably false or misleading statements, *i.e.* that Respivir was unquestionably efficacious. Thus Mott allegedly stated on April 27, 1993, that "[t]he results of treatment with Respivir were highly statistically significant along all of the efficacy parameters built into the Phase III study. *There's absolutely no question about efficacy.* ... The data are overwhelmingly good.... We've exceeded the rule of thumb standards (emphasis added)."

That statement arguably goes beyond a bona fide claim that the test data are "valid" or the drug "efficacious." Given that the FDA review was well under way, the statement might well contain in its sweep a representation that the FDA had raised no question about the efficacy of the drug when in fact quite possibly it had. *Compare In Re Synergen, Inc. Sec.* (manufacturer claimed drug "will treat *all* patients ... regardless of their underlying infection"). Certainly a rea-

sonable investor reading the statement might reach that opinion; in short, the capacity of the statement to mislead was there.[12] The Court thus holds that Mott's statement of April 27, 1993 regarding "efficacy" is well-pled as to fraud and sufficient to withstand Defendants' Motion to Dismiss.

■ The third category of potentially misleading statements, those involving MedImmune's explanations for the postponement of the Blood Products Advisory Committee hearing, also survives dismissal at this stage. When MedImmune announced on September 1, 1993, that FDA had postponed its review of the Respivir PLA, Defendant Hockmeyer was quoted as saying,

There are a lot of things that had to happen in a short time frame and a few pieces of data that need to continue to be analyzed. Until they (the FDA) reach a comfort level of having gone through everything, they don't feel comfortable going through the advisory committee. I don't think it's anything more than that. We understand and accept that.

A week later, on September 8, 1993, Hockmeyer was quoted in the Baltimore *Daily Record* to the effect that "the FDA simply has been unable to complete all of its necessary work on the application...."

Arguably both of these statements were attempts to reassure the public that FDA's postponement of the drug review was not a cause for concern and simply a matter of routine. But the comments of Dorothy Scott, staff fellow at FDA's Office of Blood Research and Review, reported in *Biocentury* the day after the Advisory Committee vote, suggest that, by the time of the statements, FDA may have taken a harder line and MedImmune may in fact have been aware of considerably more serious reasons for the postponement. Scott reportedly said that FDA had notified MedImmune of problems with randomization "as early as August, when a letter was sent out asking for more

---

**12.** To fulfill the materiality requirement in the § 10(b) and Rule 10(b)–5 context, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly al-

tered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 983–84, 99 L.Ed.2d 194 (1988).

information." If FDA had indeed communicated such concern to MedImmune and did so in such a way as to indicate that ultimate approval of Respivir looked problematic, then Hockmeyer's statements could possibly have misled an investor into thinking that the review process remained totally problem-free. These statements, therefore, remain in the case for purposes of discovery and trial.

█ Finally there is the statement made, inter alia, by Defendant Top in the *New England Journal of Medicine Article* dated November 18, 1993, which indicates that the Respivir study was conducted on the basis of the "intention to treat" principle. That article, hence the specific representation regarding "intention to treat," was endorsed by MedImmune, which offered to send copies of reprints to its investors. Although Defendants may dispute the precise meaning of the term, Plaintiffs have pled that "intention to treat" is a term of art with specific meaning, *i.e.* that all patients who are enrolled and randomized in a drug study are to be followed and their outcomes reported and included in the statistical analyses even if the patients do not in fact complete the course of treatment. Moreover, according to Plaintiffs, the FDA study protocol for Respivir stated that all patients who signed consent forms and were randomized into the study would be followed and their outcomes reported, a procedure which would be consistent with the intention to treat principle.[13] But in fact at least 17 children known to be eligible for participation in the study, all of whom had written consent provided, dropped out of the study, were not followed and therefore were not included in the report. According to Plaintiffs (as well as the Advisory Blood Products Committee), the absence of reliable outcome data on those 17 dropouts would make it impossible to determine which of the children experienced RSV LRI and which did not and might therefore bias the result. An investor sophisticated enough either to know the meaning of "intention to treat" or to inquire about it could arguably have been led to believe that, since the principle had re-portedly have been utilized, the statistical dependability of the study was better than it in fact was; in short, the investor could have been misled. The statement, therefore, must also remain in the case.

### V.

█ With regard to common law fraud (Count III), Plaintiffs are required to plead that a particular representation was false, made with knowledge of its falsity, made with the intent that Plaintiffs rely on it, and that there was reliance in fact. *See Martens Chevrolet Inc. v. Seney,* 292 Md. 328, 439 A.2d 534 (1982). The most prominent distinction between common law fraud and a 10(b)–5 violation is that the latter permits recovery based on a "fraud on the market" theory which presumes reliance, while the former requires proof of actual reliance. Most state courts have rejected the fraud on the market concept in connection with common law fraud claims; *see, e.g., Peil v. Speiser,* 806 F.2d 1154, 1163 n. 17 (3d Cir.1986); *In re Bexar Co. Health Facility Dev. Corp. Litig.,* 125 F.R.D. 625, 636 (E.D.Pa.1989), *but see, e.g., South Carolina Nat'l Bank v. Stone,* 139 F.R.D. 325, 333–34 (D.S.C.1991), and there is no reason to suppose that Maryland courts would do otherwise. *Cf. PPM America, Inc. v. Marriott Corp.,* 820 F.Supp. 970, 979 (D.Md.1993) (apparently finding individual reliance adequately pled); *cf. also In Re Kirschner Medical Corp. Sec. Litig.,* 139 F.R.D. 74, 83 (D.Md. 1991) (recognizing that "plaintiffs may be required to prove individual reliance"). Since failure to plead actual reliance is grounds for dismissal of the common law count, *see, e.g., Morse v. Abbott Labs,* 756 F.Supp. 1108, 1112 (N.D.Ill.1991), *In re Wyse Technology Sec. Litig.,* 744 F.Supp. 207, 209 (N.D.Cal.1990), Plaintiffs' failure to plead that element occasions dismissal of the count in this case.

### VI.

█ Plaintiffs have also pled negligent misrepresentation (Count II), a cause of

---

**13.** Defendants dispute that "intention to treat" was part of the protocol, at least initially. That, of course, is irrelevant. The *New England Journal of Medicine* article still states that the "inten-tion to treat" principle was followed and the question remains whether use of that term was false or misleading under the circumstances.

action separate and distinct from common law fraud. *See Martens Chevrolet, Inc.*, 292 Md. 328, 439 A.2d 534. Negligent misrepresentation consists of (1) a duty of care owed by defendant to plaintiff; (2) negligent assertion of a false statement by defendant; (3) intent on the part of defendant that plaintiff act upon the statement; (4) knowledge that plaintiff will probably rely on the statement which, if erroneous, will cause loss or injury; (5) plaintiff's justifiable and actual reliance on the statement; and (6) proximate damage to plaintiff. *Id.* As with the common law fraud count, failure to plead actual reliance element is fatal to the negligent misrepresentation count, but there is more. On the facts pled, the Court finds that under Maryland law Defendants would have no duty to Plaintiffs to disclose information with care. Unless an "intimate nexus" exists between a defendant and plaintiff, *e.g.* one satisfied by "contractual privity or its equivalent," *see Jacques v. First National Bank*, 307 Md. 527, 534–35, 515 A.2d 756 (1986), no duty of care arises. General public statements, including press releases aimed at the "general universe" as opposed to an identifiable group of individuals, will not give rise to the duty. *PPM Am., Inc.*, 820 F.Supp. at 979; *Tischler v. Baltimore Bancorp*, 801 F.Supp. 1493, 1506 (D.Md.1992). Since Plaintiffs' claim is clearly comprised of statements aimed at the "general universe," their pleading states no cause of action for negligent misrepresentation under Maryland law, and the count must be dismissed.

### VII.

A final word is in order with regard to whether Plaintiffs should be granted leave to amend their complaint further. This action began on December 3, 1993. Plaintiffs amended their complaints once in the course of consolidating the various actions, a process that took over four months. The current Consolidated Amended Complaint is 50 pages long and refers to and incorporates by reference extensive additional documents. Out of a mountain of alleged actionable statements, but four have survived the Motion to Dismiss and those may or may not ultimately prove successful. Under the circumstances, the Court agrees, except as specifically set forth in this opinion, that Plaintiffs should not be granted leave to replead. As in *USF & G*, 1993 WL 740188, at *8, despite a ponderous complaint and an earlier opportunity to cure pleading deficiencies, Plaintiffs have "failed to demonstrate that the underlying facts set forth a proper subject relief." Plaintiffs are not entitled to another "opportunity to test the merits of their claim," *Id.*, since, as Chief Judge Motz phrased it in *Gollomp*, 756 F.Supp. at 232, "a fraud suit cannot itself be the vehicle for initially uncovering fraud." Finally, as in *USF & G*, at least as to the vast bulk of Plaintiffs' claims, "another round of repleading would inflict undue prejudice on defendants, whose reputations have suffered under the weight of an unsupported allegation of fraud." *USF & G*, 1993 WL 740188, at *8.

### VIII.

A separate Order will be entered implementing this Opinion.

### *ORDER*

Upon consideration of Defendants' Motion to Dismiss and Plaintiffs' Opposition thereto, oral argument having been held thereon, it is 10th day of January, 1995

ORDERED that Defendants' Motion is hereby DENIED IN PART and GRANTED IN PART; and it is further

ORDERED that Defendants' Motion is DENIED with respect to the following statements:

1) Defendant Mott's alleged statement of April 27, 1993 that "[t]here is absolutely no question about the efficacy (of Respivir)";

2) Defendant Hockmeyer's September 1, 1993 statement of the reasons why the FDA had postponed its review of the Respivir product licensing application;

3) Defendant Hockmeyer's alleged statement of September 8, 1993, regarding the reasons for the delay of review of the drug by the FDA;

4) Defendant MedImmune's press release of November 17, 1993, insofar as it endorsed the upcoming *New England Journal of Med-*

*icine* article, specifically the assertion in the article that the Respivir study was conducted on an "intention to treat" basis; and

5) The *New England Journal of Medicine* article of November 18, 1993, as co-authored by Defendant Top and endorsed by Defendant MedImmune, specifically insofar as the article claimed that the study of Respivir had been conducted on an "intention to treat" basis; and it is further

ORDERED that the Motion to Dismiss is hereby GRANTED, without leave to amend, as to all other statements contained in the Consolidated Amended Complaint; and it is further

ORDERED that Counts II and III of the Consolidated Amended Complaint are hereby DISMISSED; and it is further

ORDERED that the Court's stay of discovery is hereby lifted and discovery may proceed forthwith.