**In re SEPRACOR, INC. SECURITIES LITIGATION**

No. 02–CV–12235–MEL.

United States District Court, D. Massachusetts.

March 11, 2004.

---

1. CVS makes similar arguments in its motion to dismiss.

Paul F. Bennett, Gold Bennett & Cera LLP, San Francisco, CA, for Staro Asset Management, LLC, Plaintiff.

Carole A. Broderick, Berger & Montague, Philadelphia, PA, for Staro Asset Management, LLC, Plaintiff.

Brian S Cohen, Wolf Haldenstein Adler Freeman & Herz LLP, New York, NY, for Staro Asset Management, LLC, Plaintiff.

Deborah R. Gross, Law Office of Bernard M. Gross, PC, Philadelphia, PA, for Staro Asset Management, LLC, Plaintiff.

Mary J. Johnson, Hale & Dorr, LLP, Boston, MA, for Sepracor, Inc., David P. Southwell, Paul D. Rubin, Timothy J. Barberich, Defendants.

Gregory M. Nespole, Wolf, Haldenstein, Adler, Freeman & Herz, New York, NY, for Staro Asset Management, LLC, Plaintiff.

Jeffrey B. Rudman, Hale and Dorr, LLP, Boston, MA, for Sepracor, Inc., David P. Southwell, Paul D. Rubin, Timothy J. Barberich, Defendants.

Sherrie R. Savett, Berger & Montague, P.C., Philadelphia, PA, for Staro Asset Management, LLC, Plaintiff.

Thomas G. Shapiro, Shapiro, Haber & Urmy, LLP, Boston, MA, for Staro Asset Management, LLC, Plaintiff.

Peter A. Spaeth, Hale & Dorr, LLP, Boston, MA, for Sepracor, Inc., David P. Southwell, Paul D. Rubin, Timothy J. Barberich, Defendants.

Christine M. Trowbridge, Hale & Dorr, LLP, Boston, MA, for Sepracor, Inc., David P. Southwell, Paul D. Rubin, Timothy J. Barberich, Defendants.

David L. Wales, Wolf, Haldenstein, Adler, Freeman & Herz, New York, NY, for Staro Asset Management, LLC, Plaintiff.

## MEMORANDUM AND ORDER

LASKER, District Judge.

This case is a consolidation of a number of securities fraud actions brought on behalf of all persons and entities who purchased common stock of Sepracor, Inc. ("Sepracor") from April 14, 2000 through March 6, 2002 (the proposed "Class Period"). The various actions have been reduced to two Consolidated and Amended Complaints (the "Complaints"), one on behalf of equity securities purchasers and the other on behalf of debt purchasers, containing virtually identical allegations.[1] The plaintiffs sue Sepracor and three of its officers,[2] alleging violation of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and the corresponding Securities and Exchange Commission ("SEC") Rule 10b–5, 17 C.F.R. § 240.10b–5.

Defendants move to dismiss all counts. The motion is GRANTED IN PART and DENIED IN PART.

### I. Background

For the purposes of the present motion, the allegations contained in the Complaints are accepted as true.

Sepracor is a pharmaceutical company primarily engaged in developing derivatives of existing drugs. (Compl. ¶ 31.) During the Class Period, Soltara, a non-sedating anti-histamine for the treatment of seasonal allergies, was the most promising drug in Sepracor's pipeline, and the only drug for which Sepracor had filed a New Drug Application ("NDA") with the Food and Drug Administration ("FDA"). (*Id.* ¶ 35.) By the end of 2001, Sepracor was losing money at a rate of $400 million per year, with enough funds on hand for approximately one more year. (*Id.* ¶ 34.)

Soltara is a modified version of Hismanal, which was an earlier generation of non-sedating antihistamine approved by the FDA in 1988 and used by millions of people over the following decade. (*Id.* ¶ 37.) In 1998, the FDA discovered that a very small number of people taking Hismanal had died due to cardiac arrhythmia caused by "Qt prolongation" (instability of the heart's electrical system, which can cause cardiac arrest). (*Id.*) On the basis of this finding, Hismanal was withdrawn from the market in 1999. (*Id.*) Another earlier-generation non-sedating antihistamine, Seldane, had been withdrawn in 1997 for the same reason. (*Id.* ¶ 39.) In 2000 and 2001, the FDA stated publicly several times that no new antihistamine would be

---

**1.** For the sake of convenience, all citations to the "Complaint" in this Memorandum and Order are to the Consolidated and Amended Class Action Complaint on Behalf of the Equity Securities Purchaser Class.

**2.** The individually named defendants are Timothy J. Barberich, the CEO and Chairman of the Board of Directors; Paul Rubin M.D., Executive Vice–President of Drug Development and ICE Research; and David Southwell, Executive Vice–President, CFO, and Secretary.

approved if there was any risk of potential cardiac effects. (*Id.* ¶¶ 42–46.)

Drugs sold in the United States must first be approved by the FDA. Approval by the FDA requires preclinical trials, usually done on animals, followed by at least three phases of clinical trials on humans (these trials are referred to as phases I, II, and III). When Phase III clinical trials are completed, the drug company files an NDA. After making its decision, the FDA sends one of three letters: an "approval" letter, a "not approvable" letter, or an "approvable" letter.

According to the Complaints:

.... [B]y 1999 Sepracor tested the effects of Soltara in dogs and rats. While the animal studies in each of the three FDA-approved second generation non-sedating antihistamines, Claritin, Allegra and Zyrtec[,] had not revealed any cardiac or other safety problems, in the dog and rat studies of Soltara, the drug caused potentially fatal cardiac effects, as well as liver damage. In dog studies, Soltara caused both Qt prolongation and phospholipidosis, a fat storage disorder which can result in drug-induced cirrhosis of the liver. In a rat study, Soltara caused cardiomyopathy, a potentially fatal disease of the heart muscle that causes the heart to lose its ability to pump blood, leading to cardiac arrhythmia. Moreover, the incidence of cardiomyopathy in rats treated with Soltara was dose dependent, *i.e.* the incidence increased with increasing doses of the drug, demonstrating that the cardiomyopathy was drug-induced. The rat study was disastrous for [Sepracor], because cardiomyopathy is highly unpredictable in humans, making it extremely difficult to prove that the drug would not cause cardiomyopathy in some humans. Due to the FDA's announced zero tolerance policy for cardiac effects in antihista-

mines for which FDA approval was sought, the rat study as well as the Qt prolongation in a dog study meant that Sepracor would have to prove that Soltara could not cause potentially fatal cardiac effects in humans, which requires far more than the human safety studies that were conducted for the existing FDA-approved antihistamines or the safety studies conducted by Sepracor.

(Compl.¶ 53.)

Johnson & Johnson, which had agreed to jointly fund the development of Soltara and share the profits, withdrew its participation in May 1999, following the animal studies. (*Id.* ¶¶ 48–49.) Sepracor, however, continued to develop Soltara, proceeding to clinical trials. The aim of the clinical trials was to demonstrate that Soltara was safe to use in humans. According to the complaints, however:

Sepracor's safety studies of Soltara, ... were not designed to provide the necessary evidence that the effects seen in animals could not occur in humans, because, inter alia, they did not provide evidence that the drug could not cause cardiac effects or organ damage at the highest possible accumulation in the patient's body.

(Compl.¶ 54.) This was so, plaintiffs contend, because the clinical trials measured the safety of the drug only at maximum plasma (blood) concentration rather than at maximum tissue concentration. Antihistamines such as Soltara reach maximum plasma concentration within two weeks, but continue to build up in tissue for approximately ninety days.

As detailed below, plaintiffs allege that defendants made numerous public statements regarding the safety of Soltara that omitted any mention of the side effects that were observed in the animal studies. Defendants also made numerous state-

ments expressing confidence that Soltara would gain FDA approval. Additionally, in public statements regarding the clinical trials, defendants made reference to testing Soltara at "maximum concentration" without making clear that the level of concentration tested was maximum plasma accumulation rather than maximum tissue accumulation. Plaintiffs allege that these statements were materially misleading and artificially inflated the market price of Sepracor securities.

On March 7, 2002, Sepracor announced that the FDA had issued a "not approvable" letter regarding the company's application to market Soltara. Sepracor issued a press release that day stating:

> The FDA identified three issues that are not adequately addressed in light of certain aspects of the drug's pharmacokinetics and potential for accumulation in tissue. Two of the issues pertained to observations for safety studies in animals that were not observed in humans: phospholipidosis (an adaptive storage response to drug administration) and cardiomyopathy (pathologic condition of the heart muscle). A third issue concerned the need for additional assurance of the absence of any potential for Qtc prolongation (an effect on electrical impulse conduction in the heart).

> It is Sepracor's interpretation of the FDA's concerns that, as a result of [Soltara's] long terminal elimination phase in both normal and cardiac-compromised patients, a review of the kinetic data in man suggests that Sepracor's safety evaluations were not of sufficient duration to provide adequate safety data at tissue steady-state.

> Due to SOLTARA's extended elimination phase, the FDA also concluded that additional evaluation of tissue concentrations of the drug after prolonged exposure were needed to quantify the poten-

tial for [Soltara's] accumulation in target organs.

(Compl. ¶ 91.)

When this information was made public, the price of Sepracor stock fell approximately 60% from a closing price of $47.26 on March 6, 2002, to a closing price of $19.64 on March 7, 2002. (*Id.* ¶ 92.)

Tim Bepler, a portfolio manager at Acacia Research Investment Corp., was quoted in a March 7, 2002 *Bloomberg* article as saying that the FDA's mention of possible cardiac effects was "a huge surprise" because previously public investors "hadn't seen any cardiac effects in the data" that was made publicly available by Sepracor. (*Id.* ¶ 97.) A report by Morgan Stanley Dean Witter the following day stated that "the majority of the [March 7] sell-off was a rational response by investors to the negative news" and that "[m]anagement credibility will definitely be an issue going forward, which will probably weigh down on the stock." (*Id.* ¶ 98.) The report further stated that the FDA had previously told Sepracor that the animal studies showing cardiac and liver damage were issues that had to be resolved. (*Id.*)

On October 22, 2002, Sepracor issued a press release stating that contingent upon successful completion of "approximately ten additional clinical (human) studies and ten additional preclinical studies," it would file an amendment to its NDA. (*Id.* ¶ 100.) In a public conference call the same day, a Sepracor spokesperson stated that it would be necessary to conduct nine-month studies of the effect of Soltara in primates and pigs, and that, assuming successful completion of the additional studies, Sepracor would not file an application with the FDA for marketing approval until 2004, with the result that revenues from the drug would not be realized until 2005. (*Id.*)

## II. Applicable Law

To state a claim under Section 10(b) and Rule 10b–5, plaintiffs must allege with particularity that defendants (1) made a false statement or omission of material fact (2) with scienter (3) upon which defendants justifiably relied (4) that proximately caused plaintiffs' damages. *See Gross v. Summa Four, Inc.*, 93 F.3d 987, 992 (1st Cir.1996). A fact is material if there is a substantial likelihood "that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). While Rule 10b–5 does not create an affirmative duty of disclosure, "such a duty may arise if ... a corporation has previously made a statement of material fact that is either false, inaccurate, incomplete, or misleading in light of the undisclosed information." *Gross*, 93 F.3d at 992.

Under Fed.R.Civ.P. 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Under the Private Securities Litigation Reform Act ("PSLRA"), plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with [intent to deceive]." 15 U.S.C. § 78u–4(b)(2).

The "safe harbor" provision of the PSLRA defines "forward-looking statements" to include projections of revenues, income and earnings, statements of management's plans and objectives for future operations, statements about future economic performance, and disclosure of the issuer's assumptions underlying the foregoing. 15 U.S.C. § 78u–5(i)(1). Forward-looking statements are not actionable if one of the following three conditions is met: (1) the statement is identified as forward-looking and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement"; (2) the statement is "immaterial"; or (3) the plaintiff does not plead that the statement was made with actual knowledge that the statement was false or misleading. 15 U.S.C. § 78u–5(c).

## III. Allegedly Fraudulent Statements

The statements alleged to be fraudulent fall into three categories: (1) statements regarding the results of the animal studies; (2) statements regarding the prospects for FDA approval of Soltara; and (3) statements regarding the clinical trials which ostensibly tested Soltara at "maximum concentration." The statements regarding the animal studies all raise the same questions of law, and are accordingly analyzed together; the statements in the second and third categories are numbered as Statements 1–7 for clarity and convenience.

### A. Statements Regarding Animal Studies

On May 17, 1999, in a public conference call held by Sepracor, defendant Rubin stated that:

> [O]bviously with all antihistamines now, there is always going to be issues concerning the evaluation of its potential for this Qtc prolongation side effect. We did a number of preclinical trials. *From these studies, we determined that norastemizole [Soltara] was anywhere from 100–1000 fold less likely to cause any significant Qtc prolongation.* In fact, as you see, this has been substantiated at least in our clinical studies to date... Also, we have everything in place from a preclinical perspective in terms of a late 2000 regulatory submission ... In addi-

tion, we looked at mean changes in Qt and Qtc, which is a corrective value of Qt prolongation, and in fact, *there were no clinically relevant or statistically significant differences in changes in Qt when you looked at norastemizole doses compared to placebo .... At least in [initial studies in patients], there is no obvious difference between norastemizole and placebo in terms of Qt prolongation or sedation.* We have a number of large scale trials planned between now and time of [NDA] filing ... that would allow us to conduct adequate studies to round our dossier for this particular drug.

(Compl. ¶ 55, emphasis added).

On November 15, 1999, at the annual meeting of the American Academy of Allergy, Asthma and Immunology, Dean Handley, Sepracor's Senior Director, Office of Medical Communications and Scientific Affairs, reported that "virtually no change in the Qtc interval" was observed in relatively large doses of the drug, and that no change in Qtc interval was observed either one or two weeks into treatment that would indicate any cardiac propensity. He then stated that "these clinical data are well-substantiated by a variety of molecular, genetic, and animal studies." These representations were published by Med–Association Communications in an article that was posted on the Internet. (*Id.* ¶ 57.)

On October 19, 2000, after announcing that Eli Lilly had terminated the licensing and development of an unrelated drug with Sepracor due to Qt prolongation, Sepracor stated in a conference call that "Qtc prolongation has not cropped up as a side effect in trials of other drugs in its extensive pipeline." (*Id.* ¶ 59.)

A press release issued by Sepracor on December 4, 2000 stated "In clinical trials to date, norastemizole [Soltara] has dem-

onstrated ... no observed cardiovascular side effects." (*Id.* ¶ 62.)

The same day, Sepracor held an investor/analyst meeting in New York City, which included presentations by each of the Defendants and was described by analysts in attendance as "upbeat." (*Id.* ¶ 64.) Rubin stated that Sepracor expected to launch Soltara in 2002, and reassured investors that Soltara appeared to have no cardiac effects. (*Id.* ¶ 65.)

On January 29, 2001, Sepracor issued a press release summarizing the preclinical studies of Soltara and stating in relevant part: "In clinical studies to date, [Soltara] has demonstrated ... no apparent cardiovascular side effects." (*Id.* ¶ 67.)

### B. *Analysis of Statements Regarding Animal Studies*

■ As a threshold matter, the statements at issue are material. If, as plaintiffs allege, the FDA had previously stated a "zero tolerance" policy for any cardiac side effects, including those found in animal studies, then information about cardiac side effects in the animal studies of Soltara would "have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic*, 485 U.S. at 231–32, 108 S.Ct. 978.

■ Furthermore, the subject matter of the alleged misrepresentations—the results of the animal studies—were a matter of fact rather than conjecture by the time the statements were made. Thus, the statements cannot be characterized as forward-looking, and the safe harbor provision of the PSLRA does not apply.

■ The question to be resolved, therefore, is whether plaintiffs have adequately alleged scienter.

The Complaints make the following allegations regarding scienter:

Defendants knew from the animal studies that Soltara caused Qt prolongation and phospholipidosis in dogs and cardiomyopathy in rats, as this information was included in the NDA for Soltara filed with the FDA;

Soltara was a derivative of Hismanal, which had been withdrawn from the market because of Qt prolongation;

Defendants knew that Sepracor's stock price had dropped approximately 30% when it was announced that its Prozac derivative would not be developed because of Qt prolongation;

Sepracor had a high cash burn rate;

Defendants had the motivation to misrepresent and conceal the facts about Soltara's prospects so that Sepracor could raise almost one billion dollars in sales of debt securities to the public. In February 2000, Sepracor issued $400 million face value of § Convertible Subordinated Debentures due 2007 and issued an additional $60 million on March 9, 2000. In November 2001, Sepracor issued $400 million face value of 5–3/4% Convertible Subordinated Notes due 2006 and issued an additional $100 million in December 2001.

Defendants repeatedly represented that Soltara was Sepracor's most advanced drug which was likely to produce huge near-term revenues. Since Sepracor's near-term success and the credibility of its technology substantially depended on Soltara, defendants had the motive to mislead the market about the prospects of Soltara.

Defendants knew from public FDA pronouncements that an antihistamine would not be approved by the agency if there was any reason to believe that the drug might cause fatal cardiac effects, particularly where the drug was derived from a drug that had such effects, and that the required evidence of the absence of such effects included animal studies.

(Compl.¶ 103.)

Defendants argue that Plaintiffs offer only conclusory allegations that Soltara caused Qt prolongation and phospholipidosis in dogs, and fail to cite any specific information such as the percentage of dogs who developed these conditions, the degree of severity of the conditions, or the doses at which the dogs developed the conditions. Similarly, they note that Plaintiffs' allegations regarding the rat studies include no statistical data from the studies which would support an inference that Sepracor knew the studies would adversely impact the chances for FDA approval of Soltara.

Defendants further contend that plaintiffs have failed to identify any specific facts, supported by sources, showing that prior to being informed of the FDA's decision to issue a not approvable letter, Sepracor had any reason to believe the animal studies jeopardized approval of the NDA for Soltara. Allegations of a subjective scientific disagreement, they argue, amount to nothing more than "fraud by hindsight." *In re Medimmune, Inc. Sec. Litig.*, 873 F.Supp. 953, 966 (D.Md.1995) (citation omitted). Defendants point out that the only specific fact cited in the Complaints regarding the animal studies is a statement made at the 2000 annual meeting of the American College of Allergy, Asthma & Immunology by Dr. Lawrence DuBuske, who worked with Sepracor on the testing of Soltara. At the meeting, DuBuske disclosed that "[a]nimal studies have demonstrated alteration of Qtc intervals only at extremely high concentrations;" that the drug had "no cardiac toxicity at normal doses;" and that "[p]reclinical studies of [Soltara] are very promising."

(Trowbridge Aff., Exh. I, at 6.) The initial portion of this statement is quoted in ¶ 61 of the Complaints, apparently to demonstrate that Sepracor had knowledge of the side effects exhibited in the animal studies.[3] Defendants argue that, when considered in full, the statement raises the opposite inference: that Sepracor did *not* seek to hide the results of the animal studies, and that it did not see the side effects as obstacles to FDA approval.

In addition, Defendants argue that scienter may not be inferred from the individual defendants' high level positions at Sepracor. Such generic and conclusory allegations of "scienter by status," defendants contend, have been found by the First Circuit to be inadequate to establish the strong inference required by the PSLRA. *See Maldonado v. Dominguez,* 137 F.3d 1, 9 (1st Cir.1998). Moreover, defendants contend, courts have rejected generic motives of ensuring corporate success, which could be imputed to officials of any publicly-owned enterprise. *See, e.g., Nathenson v. Zonagen, Inc.,* 267 F.3d 400, 410 (5th Cir.2001); *Novak v. Kasaks,* 216 F.3d 300, 307 (2d Cir.2000).

Plaintiffs counter that it is well established that liability may be imposed under Rule 10b–5 where a defendant knowingly or recklessly makes false or misleading statements about the safety profile of a drug, including the results of drug studies. *See, e.g., In re Amylin Pharms., Inc. Sec. Litig.,* 2003 WL 21500525 (S.D.Cal. May 1, 2003), 2003 U.S. Dist. LEXIS 7667; *In re Viropharma, Inc. Sec. Litig.,* 2003 WL 1824914 (E.D.Penn. Apr. 3, 2003), 2003 U.S. Dist. LEXIS 5623; *In re Neopharm, Inc. Sec. Litig.,* 2003 WL 262369, *14 (N.D.Ill. Feb. 7, 2003), 2003 Dist. LEXIS 1862, *43–44. They further argue that

defendants' reliance on *Medimmune* is misplaced: while the court in *Medimmune* dismissed allegations that the company should have disclosed design defects in the drug study, it held that false statements about the drug tests *were* actionable. *Medimmune,* 873 F.Supp. at 967. Here, plaintiffs contend, defendants made material omissions regarding the results of the animal studies, and thus have no defense of having merely conducted "bad science."

Plaintiffs further contend that, in light of the FDA's "zero tolerance" policy, the mere presence of *any* side effects in the animal studies would have been cause for concern by investors. Therefore, they argue, it is not necessary for the Complaints to cite specific information regarding the frequency or severity of the conditions that were observed. They cite the observation of the court in *Amylin:*

> There is nothing unlawful about taking a calculated risk. However, if, as Plaintiffs allege, Defendants misled Plaintiffs about such risks by making assurances regarding the completeness of the data and the likelihood of FDA approval, Defendants may be held liable.

2003 WL 21500525, at *5, 2003 U.S. Dist. LEXIS 7667, at *13.

■ The Supreme Court has defined scienter as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The First Circuit has adopted a fact-specific, case-by-case approach rather than a rigid formula for alleging scienter. *See In re Cabletron Systems, Inc.,* 311 F.3d 11, 39 (1st Cir.2002). "Scienter may be demonstrated by indirect evidence, and may extend to a form of extreme reckless-

---

**3.** The complaints do not allege that there was anything fraudulent about the statement itself, nor is Dr. DuBuske named as a defendant.

ness that is closer to a lesser form of intent." *Id.* (internal quotation and citation omitted). Scienter may be established by allegations of defendants' motive and opportunity to commit the alleged fraud, although "'catch-all allegations,' which merely assert motive and opportunity, without something more, fail to satisfy the PSLRA." *Id.* (citations omitted).

As noted above, the PSLRA requires plaintiffs in private securities lawsuits to "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2) (emphasis added). However, the inference of scienter "need not be irrefutable." *Cabletron,* 311 F.3d at 38 (citation omitted).

This case presents a close call. The Complaints do not present a "smoking gun" in the form of internal Sepracor memoranda or evidence of insider trading. However, according to the Complaints, the cardiac side effects of Soltara's predecessor Hismanal were rare and difficult to predict in humans, and *any* indication that such side effects might possibly arise in humans had been identified by the FDA as cause for concern. Moreover, there were already three non-sedating antihistamines on the market which caused *no* cardiac side effects. In light of this combination of factors, the Complaints allege, the FDA had articulated an extremely strict stance against even the faintest possibility of cardiac side effects in any new antihistamines being developed. In addition, the Complaints allege, Sepracor was burning cash at a high rate and was dependent on Soltara as the most promising drug in its

pipeline. The First Circuit has indicated its willingness to consider many different types of evidence as relevant to scienter, including "the self-interested motivation of defendants in the form of saving their salaries or jobs." *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 196 (1st Cir.1999). *See also Cabletron,* 311 F.3d at 39 (strong inference of scienter where allegations constituted "more than the usual concern by executives to improve financial results; the executives' careers and the very survival of the company were on the line.")

The sum of the present allegations, taken together, does give rise to a strong inference that defendants were knowing or reckless in omitting information regarding Soltara's cardiac side effects in their public statements regarding the safety of Soltara. Far from merely alleging "scienter by status," the Complaints set forth "specific facts that make it reasonable to believe that defendant[s] knew that [the] statement[s] [were] false or misleading." *Maldonado,* 137 F.3d at 9. This inference of scienter rests heavily on the allegations regarding the FDA's "zero tolerance" policy, a factual matter not suitable for resolution on a motion to dismiss.[4]

Accordingly, the motion to dismiss is DENIED as to the statements concerning the results of the animal studies.

### C. *Statements Regarding Prospects for FDA Approval*

*Statement 1:*

On March 12, 2001, Sepracor issued a press release announcing that it had filed an NDA with the FDA for marketing ap-

---

4. Defendants contend in a Reply Brief that the FDA's "zero tolerance" policy was confined to clinical trials; plaintiffs, in turn, argue in a Sur–Reply Brief that the policy encompassed all stages of drug testing. However, a motion to dismiss is not the ap-

propriate method by which to test the accuracy of the facts alleged in the complaint. Plaintiffs' allegations regarding the FDA's "zero tolerance" policy must be accepted as true.

proval for Soltara. The press release quoted defendant Barberich as follows: "With its expected product characteristics, SOLTARA has the potential to be an important new entrant in [the] fast-growing allergy marketplace." (Compl.¶ 69.)

*Statement 2:*

On July 23, 2001, Sepracor conducted a quarterly conference call in which Rubin stated that the company was "confident" that the FDA would approve Soltara. (*Id.* ¶ 70.)

*Statement 3:*

On January 23, 2002, in a quarterly conference call for securities analysts and investors, in which all the individual defendants participated, Rubin stated that Soltara "can attack any of the current antihistamines and win." He also stated that an "approvable letter" for Soltara was expected from the FDA on March 11, 2002, with final approval in the summer of 2002, and that revenues were expected to amount to $100 million in 2002 and $2 billion by 2005. (*Id.* ¶¶ 85–86.)

As to Statements 1 and 3, Defendants argue that they are inactionable under all three prongs of the PSLRA's safe harbor provision. According to Defendants, the statements are precisely the type of puffery that courts have rejected as immaterial. *See, e.g., In re Allaire Corp. Sec. Litig.*, 224 F.Supp.2d 319, 332 (D.Mass.2002) (no liability for "vaguely optimistic platitudes that are constantly bandied about in the marketplace"). Moreover, they contend, the statements were identified as forward-looking and accompanied by ap-

propriate cautionary language. Statement 1 included the following warning:

> This news release contains forward-looking statements that involve risks and uncertainties, including statements with respect to the safety, efficacy and potential benefits of the Company's ICE pharmaceuticals under developments. Among the facts that could cause actual results to differ materially from those indicated by such forward-looking statements are: the submission of NDAs, acceptance of submitted NDAs for filing, and approval of NDAs; the results of the Company's clinical trials with respect to its products under development; the commercial success of Sepracor's products; the ability of the Company to attract and retain qualified personnel; the scope of the Company's patent prosecution with respect to such product candidates; the availability of sufficient funds to continue research and development efforts; and certain other facts that may affect future operating results and are detailed in the Company's periodic reports filed with the Securities and Exchange Commission.

(Trowbridge Aff., Exh. A.[5]) The warning that accompanied Statement 3 was as follows:

> Certain statements included herein may be considered forward-looking statements. There are a number of factors that could cause actual results to differ materially from those anticipated by these statements. Those factors are listed in the company's filings with the SEC.

(Trowbridge Aff., Exh. F, at 2:21–3:3.[6]) Finally, Defendants argue that the state-

---

**5.** The SEC filings referred to in the statement included warnings such as "WE HAVE NEVER BEEN PROFITABLE AND WE MAY NOT BE ABLE TO GENERATE REVENUES SUFFICIENT TO ACHIEVE PROFITABILITY"

and "Our potential products may not … be proven safe and efficacious in clinical trials."

**6.** As of the date of the conference call, Sepracor's SEC filings contained substantially the

ments are not actionable because Plaintiffs have failed to allege specific contemporaneous facts showing that Sepracor had actual knowledge that the challenged statements were false or misleading at the time that they were made.

As to Statement 2, Defendants do not contest its materiality but contend that it is inactionable under the second and third prong of the safe harbor provision. They note that it was accompanied by the following cautionary statement:

> I'll start by reading the Safe Harbor statement which applies to the whole conference call. Some statements included herein may be considered forward-looking statements, there are a number of factors that could cause actual results to differ materially from those anticipated by the statement, those factors are listed in the company's filings with the SEC.

(Trowbridge Aff., Exh. C, at 3:10–18.[7]) Defendants also repeat the argument, advanced with regard to Statements 1 and 3, that Statement 2 is inactionable because Plaintiffs have failed to allege specific contemporaneous facts showing that Sepracor had actual knowledge that the challenged statement was false or misleading at the time that it was made.

Plaintiffs argue[8] that the cautionary statements cannot insulate Defendants from liability because the misrepresentation at issue concerned critical facts re-

garding studies that had *already* been performed. They contend that an opinion or statement of belief is actionable if there are undisclosed facts that seriously undermine the accuracy of the statement. *See Helwig v. Vencor, Inc.*, 251 F.3d 540, 557 (6th Cir.2001), *cert. denied,* 536 U.S. 935, 122 S.Ct. 2616, 153 L.Ed.2d 800 (2002); *Rubinstein v. Collins,* 20 F.3d 160, 166 (5th Cir.1994); *In re Wells Fargo Sec. Litig.,* 12 F.3d 922, 930 (9th Cir.1993). Moreover, they argue, the cautionary statements were not "meaningful" as required by 15 U.S.C. § 78u–5(c)(1)(A) because they were not tailored to the representations regarding the animal studies. *See In re Amylin Pharms., Inc. Sec. Litig.,* 2003 WL 21500525, at *7 (S.D.Cal. May 1, 2003), 2003 U.S. Dist. LEXIS 7667, at *21 (holding that purported cautionary statements were not meaningful because they were not tailored to representations regarding sufficiency of clinic trials).

*Analysis of Statements 1, 2, and 3*

In certain circumstances, vague statements expressing confidence in a product's potential would undoubtedly, as Defendants argue, be deemed mere puffery. However, such a conclusion is not possible in light of the factual context alleged here. Defendants' predictions regarding Soltara's future contain "at least three implicit factual assertions: (1) that the statement is genuinely believed, (2) that there

---

same list of risk factors described above in connection with Statement 1.

**7.** The SEC filings referred to here contained risk statements virtually identical to those quoted in connection with Statement 1. In addition, on March 28, 2001, Sepracor had filed a Form 10–K for the year ending December 31, 2000 which described the FDA approval process and warned that

> We may not successfully complete Phase I, Phase II or Phase III testing within any specified time period, if at all, with respect

to any of our products subject to this testing. Furthermore, the FDA may not accept our evidence that a particular product meets our claims of superiority.

(Trowbridge Aff., Exh. E, at 21.)

**8.** Plaintiffs, without explanation, fail to address Statement 1 in their opposition brief. However, they present arguments in connection with Statements 2 and 3 that appear equally applicable to Statement 1 and will be construed as relating to all three.

is a rational basis for that belief, and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement." *Helwig*, 251 F.3d at 557 (*quoting In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 113 (9th Cir.1989)). As concluded above, if Plaintiffs' allegations regarding the FDA's "zero tolerance" policy are accepted as true, the Complaints raise a strong inference that Defendants were aware of, or recklessly disregarded, undisclosed facts tending to seriously undermine the accuracy of any predictions about Soltara's potential success. Thus, the statements cannot be deemed mere puffery.[9] Furthermore, Plaintiffs have alleged specific contemporaneous facts (i.e., the FDA's "zero tolerance" policy) showing that Defendants had actual knowledge that the challenged statements were false or misleading at the time that they were made. Hence, neither the first nor the third prong of the safe harbor provision may shield Defendants from liability at this stage of the proceedings.

 As to the second prong of the safe harbor provision, the accompanying cautionary statements are effective only if "meaningful." 15 U.S.C. § 78u–5(c)(1)(A). "Vague or boilerplate disclaimers are insufficient to invoke safe harbor protection." *Amylin*, 2003 WL 21500525, at *7, 2003 U.S. Dist. LEXIS 7667 at *21 (citation omitted). In *Amylin*, the court found that cautionary statements in SEC filings containing general statements regarding the uncertainty of FDA approval were ineffective because they were not tailored to

the defendants' statement regarding the sufficiency of clinical trial results. The court concluded that concerns expressed by the FDA to the defendants were more significant than just a "bump in the road" and shed serious doubt on the sufficiency of the trials. *Id.* 2003 WL 21500525 at *8, 2003 U.S. Dist. LEXIS 7667 at *22. Although *Amylin* concerned clinical trials rather than, as here, animal studies, the conclusion is the same: in light of the FDA's alleged "zero tolerance" policy, the side effects observed in the animal studies represented more than a "bump in the road" for Soltara, and cast serious doubt on its prospects for FDA approval. Accepting Plaintiffs' allegations as true, Defendants would have been obliged under the circumstances to disclose known facts about the animal studies that undermined their predictions of Soltara's success. The generic cautionary statements are not sufficiently tailored to these circumstances to shield the Defendants from liability.

Accordingly, the motion to dismiss is DENIED as to Statements 1,2, and 3.

*Statement 4*

On August 6, 2001, Southwell was interviewed by the *Wall Street Transcript*, which published a transcript of the interview on the same day. In the interview, Southwell stated:

> Next year we expect to launch SOLTARA, our non-sedating antihistamine .... [W]e're very excited about the SOLTARA launch because we believe it

---

9. Throughout their brief, Defendants rely extensively on *In re Medimmune, Inc. Sec. Litig.*, 873 F.Supp. 953 (D.Md.1995), which held that "Mere expressions of hope or expectation regarding future approval, not worded as guarantees, are not actionable." However, in *Amylin*, the court commented: "This court is not bound by *Medimmune* and disagrees with

this holding. If a defendant states that it believes or expects that the FDA will approve its drug but has information tending to seriously undermine the accuracy of its statement, the statement is actionable." *Amylin* at *8, n. 3, 2003 U.S. Dist. LEXIS 7667 at 23, n. 3 (citing *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir.1989)).

has the potential to be a leader in a substantial market.

\* \* \* \* \* \*

In 2003, we expect SOLTARA revenues to grow significantly since it will be the full calendar year that we're marketing and selling the drug.

\* \* \* \* \* \*

We're a company that we think has the potential for product sales of approximately $2 billion in 2005.

(Compl.¶ 72.)

*Statement 5*

On October 12, 2001, Southwell made virtually identical statements in another interview published in the *Wall Street Transcript.* (*Id.* ¶ 75.)

Defendants argue that these statements are inactionable under the third prong of the safe harbor provision, because Plaintiffs have failed to allege specific facts showing that the statements were made with actual knowledge that they were false or misleading.

*Analysis of Statements 4 and 5*

This question again reduces to the factors considered above in determining whether scienter has been sufficiently alleged. For the reasons cited above, I conclude that the third prong of the safe harbor provision does not shield these statements.

Accordingly, the motion to dismiss is DENIED as to Statements 4 and 5.

*Statement 6:*

 During a conference call on October 19, 2001, Rubin stated that Sepracor had conducted numerous studies evaluating the safety of Soltara, and assured participants in the call that the effect of Soltara on Qt prolongation had been tested in patients in whom Soltara concentration had reached maximum concentration, which Rubin represented to mean "that another dose will not increase the exposure." He further represented that Soltara did not result in Qt prolongation in patients at maximum concentration of the drug. (Compl.¶¶ 77–78.)

Defendants argue that the statement is non-actionable on several different grounds. First, they contend, Plaintiffs have not cited contemporaneous evidence to support their assertion that this statement was false and misleading and was made with scienter—for example, evidence that any company official or researcher had questioned whether maximum concentration had been achieved, or that anyone had otherwise questioned the design, adequacy, or results of the clinical trials. They contend that the FDA's ultimate criticism of the study design, which occurred five months after the statement was made, shows only that there was a legitimate scientific disagreement between Sepracor and the FDA. Such subjective scientific disagreements, Defendants argue, do not give rise to a claim of securities fraud. They rely on *In re Medimmune, Inc. Sec. Litig.*, 873 F.Supp. at 965, in which the court dismissed allegations regarding a flawed drug study, commenting that "[m]edical researchers may well differ over the adequacy of given testing procedures and in the interpretation of test results." *Id. See also PLC Systems,* 41 F.Supp.2d 106, 121 (D.Mass.1999) ("There is nothing in the pleadings other than plaintiffs' opinions to suggest that ... the data generated, even if initially insufficient to satisfy the FDA, was fundamentally unsound or inaccurately reported."); *Nathenson,* 267 F.3d at 420 (5th Cir.2001) ("[W]here a company accurately reports the results of a scientific study, it is under no obligation to second-guess the methodology of that study.").

Defendants point to Sepracor's March 7, 2002 conference call as undermining any allegation of scienter and supporting the inference that this was a good faith scientific disagreement. In that call, Sepracor stated that it believed it needed to demonstrate safety at "plasma (blood) steady state" (which, in fact, it had), while the FDA took the position that it was required to demonstrate safety at "tissue steady state." (Trowbridge Aff., Exh. H, at 5–8.) Rubin stated that "we first heard about this concern ... that information at tissue steady state would be necessary, when we had the conference call with the FDA yesterday." (*Id.* at 7:1–4.) According to Defendants, this statement, combined with Plaintiffs' failure to cite any evidence that the FDA had previously communicated to Sepracor the need to show safety at tissue steady state (or even any public statement by the FDA regarding such a requirement), negates any possible inference of scienter.

Plaintiffs argue that in articulating its "zero tolerance" policy, the FDA had stated publicly the importance of tissue concentrations on evaluation of the effects of the drug, observing that "[m]ultiple doses may lead to greater effect on [Qt] because of accumulation." (Compl. ¶ 45.) The FDA had also stated that "U.S. experience demonstrated failure of label warnings and educational efforts to prevent serious cardiac arrhythmias and death due [to] improper use of some second generation antihistamines." (*Id.* ¶ 43.) According to Plaintiffs, such statements made clear that FDA approval of an antihistamine would not be forthcoming if there were any risk of cardiac arrhythmia caused by improper use, and that approval would require evidence that the antihistamine did not cause cardiac effects at *any* concentration in the body.

*Analysis of Statement 6*

"The securities laws do not impose a duty to conduct 'good science.'" *PLC Systems*, 41 F.Supp.2d at 121. Hence, the inadequacy of the clinical trials alone is insufficient to allege fraud. However, at issue here is not the design of the study itself but the representation by Rubin that the study tested the safety of Soltara at "maximum concentration" "such that another dose will not increase exposure." It is undisputed that, because antihistamines continue to accumulate in the body after maximum plasma concentration is reached, another dose in fact *would* have increased exposure. Once again, the question comes down to whether Plaintiffs have sufficiently alleged that this material misrepresentation was made knowingly or recklessly.

Here, Plaintiffs' allegations are considerably weaker than those put forth with regard to the statements discussed above. Plaintiffs note in their own brief that there was no FDA approved protocol at the time for the testing of Soltara at the maximum exposure in patients' bodies, and that such testing was, as Defendants stated in a conference call in October 2002, "state-of-the-art," i.e., experimental. The FDA statement cited by the Plaintiffs—"[m]ultiple doses may lead to greater effect on [Qt] because of accumulation"—does not specify tissue rather than plasma accumulation. Thus, although the allegations in the Complaints may raise an inference that Defendants knew or recklessly disregarded the misleading nature of the statement, they do not raise the *strong* inference required in a securities fraud action.

Accordingly, the motion is GRANTED as to Statement 6.

*Statement 7*

 In early November, 2001, Sepracor's senior management met with Gregory B. Gilbert, a Merrill Lynch securities analyst, and assured him that "Soltara's

efficacy and safety would make it a key player in the multi-billion dollar antihistamine market" and that "investor concerns about the safety of Soltara were misplaced." During the meeting, Sepracor senior management told Gilbert that "it previously met with [the] FDA to identify all necessary trials that need to be done to put the Qt issue to rest." These statements were reported to the investing public in a Merrill Lynch report on November 12, 2001. (Compl.¶ 83–84.)

Defendants repeat their contentions with regard to scienter, and argue additionally that this allegation is not actionable because the Complaints fail to identify the speaker by name, as required by Fed. R.Civ.P. 9(b). *See In re Newbridge Networks Sec. Litig.*, 962 F.Supp. 166, 173 (D.D.C.1997) (analyst's report of beliefs of "Newbridge management" defective because it "failed to identify who at Newbridge held these beliefs"). *See also, Boston Tech.*, 8 F.Supp.2d 43, 55 (D.Mass. 1998) ("[A] plaintiff is required to allege with particularity the time, place, content and speaker of the issuer's communication with the analysts. . . .").

In opposition, Plaintiffs cite *Cabletron*, in which the First Circuit articulated an "entanglement" test to determine whether statements by third parties were attributable to defendants. *Cabletron*, 311 F.3d at 38 (citation omitted). One of the statements deemed actionable in *Cabletron* was based on "information from Levine and other Cabletron executives." *Id.* Citing this example, Plaintiffs argue that, under controlling precedent in this Circuit, they are not required to identify the senior management by name. Plaintiffs further note that *Newbridge Networks*, relied upon by the Defendants, has been criticized for failing to comport with the liberal pleading requirements of the federal rules. *See International Motor Sports Group, Inc. v. Gordon*, 1999 WL 619633, *4 (S.D.N.Y.

Aug. 16, 1999), U.S. Dist. LEXIS 12610, *14.

*Analysis of Statement 7*

Plaintiffs stand on stronger ground here than with regard to Statement 6. Two elements of the statement, that "Soltara's efficacy and safety would make it a key player in the multi-billion dollar antihistamine market" and that "investor concerns about the safety of Soltara were misplaced," are subject to the same scienter analysis as the statements regarding the animal studies and Soltara's prospects for success. For the reasons discussed above in connection with those statements, the Complaints raise a strong inference of scienter.

The third element of the statement, that Sepracor "previously met with [the] FDA to identify all necessary trials that need to be done to put the Qt issue to rest," must be viewed in light of the FDA's ultimate decision not to approve the NDA due to concerns about the sufficiency of the clinical trials. If, as Sepracor argues in connection with Statement 6, the FDA did not reveal its view of the necessary scope of the clinical trials until March 6, 2002, it cannot be true at the same time that the FDA had, by November 2001, identified "all necessary trials that need to be done to put the Qt issue to rest." Furthermore, the allusion to "investor concerns about the safety of Soltara" bolsters the inference that a misrepresentation regarding the FDA's purported approval of the clinical trials was made with scienter.

Although scienter has been properly alleged, however, the statement fails to clear the hurdle imposed by Rule 9(b). Rule 9(b) requires that plaintiffs "(1) specify the statements that the plaintiff contends were fraudulent, (2) *identify the speaker*, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Suna v. Bailey Corp.*, 107 F.3d 64, 73 (1st

Cir.1997) (citation omitted, emphasis added). *Cabletron* did not alter this standard. The two analyst reports identified by the *Cabletron* court as meeting the entanglement test were (1) a report "based on information from Levine and other Cabletron executives," and (2) a report "based on a presentation by a named Cabletron official responsible for investor relations." *Cabletron,* 311 F.3d at 38. It is not clear from the Cabletron decision whether the identity of the "other Cabletron executives" was omitted from the complaint or merely from the decision; in any case, however, at least one executive—Levine—was identified, and the court took particular note of the fact that the second report was based on a presentation by a *named* source.

Accordingly, the motion will be GRANTED with regard to Statement 7 unless Plaintiffs amend the Complaints within 45 days to include the name or names of the speakers.

In sum, except as to Statements 6 and 7, the Complaint meets the pleading requirements of Rule 9(b) and the PSLRA, and the motion to dismiss is DENIED.

It is so ordered.